

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

EVA MARIE PHILLIPS, on behalf of
herself and others similarly situated,
857 Brady Avenue
Barberton, Ohio 44203

and

GREG A. PHILLIPS, on behalf of
himself and others similarly situated,
9005 Thomas Hill Road
Tarlton, Ohio 43154,

     Plaintiffs

vs.

PHILIP MORRIS COMPANIES
    INC., nka ALTRIA GROUP, INC.
6601 W. Broad St.
Richmond, VA 23230

and

PHILIP MORRIS INCORPORATED,
    a.k.a. PHILIP MORRIS INC.,
    a.k.a. PHILIP MORRIS USA
    INCORPORATED, a.k.a PHILIP
    MORRIS USA INC.
c/o CT Corporation System
1300 East Ninth St.
Cleveland, OH 44114,

    Defendants

Case No. 5:10CV1741

JUDGE LIOI

MAG. JUDGE LIMBERT

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**COMPLAINT**

**(Type: Ohio Consumer Sales
Practices Act, Fraud, Express
Warranty, Implied Warranty, Ohio
Deceptive Trade Practices Act,
Unjust Enrichment, Injunction,
Class Action)**

**Jury Demand**

1

———

\*     \*     \*

Plaintiffs Eva Phillips and Greg Phillips allege on behalf of themselves and all others similarly situated, on information and belief based, *inter alia*, upon the investigation of their counsel, except as to those allegations which pertain to the named Plaintiffs or their attorneys, which are alleged on personal information and belief, as follows:

## I.    NATURE OF THE ACTION

1.      This action has previously been dismissed otherwise than upon the merits and without prejudice to a future action within one year of this re-filing (Ohio Revised Code Section 2305.19).  Specifically, this action was originally filed in Medina County, Ohio, Court of Common Pleas, Judge James J. Kimbler, Case Number 01-CIV-0413 and was dismissed otherwise than upon the merits and without prejudice to a future action on August 10, 2009.

2.      This action was previously certified as a class action under the Ohio Consumer Sales Practices Act (O.R.C. Section 1345 ). It was decertified by the Ohio Supreme Court, who found that it did meet the prior notice requirement of the CSPA. In *Marrone v. Philip Morris USA, Inc.*, 110 Ohio St.3d 5, 2006-Ohio-2869, at ¶30, the Court stated:

> "…The plaintiffs may be entitled to pursue class- action relief under Civ.R. 23; however, they have failed to identify any prior rule or court decision that would entitle them to pursue CSPA relief under R.C. 1345.09(B)."

3.      This is a class action under the Ohio Consumer Sales Practices Act, Ohio Revised Code § § 1345.01, et seq., Fraud, Express Warranty, Implied Warranty, Ohio Deceptive Trade Practices Act, Ohio Revised Code § § 4165.01, et seq., Unjust Enrichment, and Injunction for economic damages, and declaratory and injunctive relief on behalf of persons who purchased in Ohio and consumed Marlboro Lights "low-tar," filtered cigarettes manufactured, distributed and/or sold by defendants Philip Morris Companies Inc., nka Altria Group, Inc., and Philip Morris Incorporated, a.k.a. Philip Morris Inc., a.k.a. Philip Morris USA Incorporated, a.k.a. Philip Morris USA Inc., (hereinafter, collectively "Philip Morris" or "Defendants"). "Light cigarettes" are generally defined as cigarettes containing between seven and fifteen milligrams of tar. Damages sought by this class do not include any claims for personal injury, and claims for personal injury are expressly not a part of this lawsuit.

4.      As more fully set forth herein, Defendants manufacture so-called "low-tar," filtered cigarettes under the brand name Marlboro Lights. Defendants distribute and sell Marlboro Lights in Ohio and throughout the United States.

5.      By the late 1960s, scientific studies, including some endorsed by the Surgeon General, revealed that higher tar and nicotine levels correlated with a significantly increased risk of developing smoking-related diseases. Defendants viewed these findings as a threat to their corporate welfare. In response, Defendants waged a campaign of deception and omission on Ohio consumers which persists to this day.

3

Philip Morris started selling Marlboro Lights cigarettes, packaged and sold as being "Light" and as having "Low Tar" or "Lowered Tar & Nicotine."

6.     While promoting decreased tar and nicotine deliveries, Defendants designed Marlboro Lights cigarettes to deliver higher levels of tar and nicotine than could be measured by the standard testing apparatus. Defendants thereby achieved apparent support for their claim that their cigarettes were "light" and that their cigarettes contained low tar and nicotine. Additionally, Defendants failed to disclose that the smoke produced by Marlboro Lights is also more genotoxic (causing genetic and chromosomal damage) per milligram of tar than the smoke from 'regular' cigarettes.

7.     Defendants engaged in a common course of deceptive and unlawful conduct in connection with the manufacture, distribution, promotion, marketing and sale of Marlboro Lights cigarettes by:

a)     falsely and/or deceptively claiming that their product delivers lower tar and nicotine in comparison to regular cigarettes;

b)     failing to disclose the material fact that the so-called lowered tar and nicotine deliveries of their product were unrelated to benign changes in the content of the tobacco in Marlboro Lights, but rather depended on deceptive changes in cigarette design and composition. These changes include the addition of microscopic vent holes on or around the cigarette filter that theoretically dilute the tar and nicotine content of smoke per puff as measured by the industry standard testing apparatus, and alteration of the materials used in filters and cigarette paper;

4

c) failing to disclose the material fact that Defendants intentionally manipulated the design and content of Marlboro Lights in order to maximize nicotine delivery while falsely and/or deceptively claiming lowered tar and nicotine. These manipulations include the modification of tobacco blend, weight, rod length, and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH level by chemical processing and additives, such as ammonia, which resulted in the delivery of far greater amounts of tar and nicotine when smoked under realistic conditions than Defendants' claims of lowered tar and nicotine would support;

d) failing to disclose that these changes in design and composition were intended by Defendants to fool the machine tests that Defendants use as a basis to market their cigarettes as "lights;" and

e) failing to disclose the material fact that the techniques employed by Defendants that purportedly reduce the levels of tar in their Marlboro Lights actually increase the harmful biological effects, including mutagenicity (genetic or chromosomal damage) caused by the tar ingested by the consumer.

8. Defendants' purpose in controlling the tar and nicotine delivery of Marlboro Lights under machine testing conditions is to achieve artificially low tar and nicotine ratings to lend credence to their claims that Marlboro Lights are "light" and contain "low tar" or "lowered tar & nicotine." In fact, Defendants conducted their own internal tests to ensure that the actual amounts of tar and nicotine delivered under normal use remained at higher levels.

9. Defendants' representations that Marlboro Lights cigarettes deliver lower tar and nicotine are illusory. Defendants have unfairly and unjustly profited from their failure to adequately disclose to consumers the true nature and function of their so-called "light" cigarettes.

10. Plaintiffs seeks a refund of all sums they and each of the Class members paid to purchase Marlboro Lights cigarettes manufactured, distributed and/or sold by Defendants to purchasers in Ohio, or, in the alternative, disgorgement of Defendants' ill-gotten profits attributable to purchases made by each of the class members. Plaintiffs also seeks damages under the Ohio Consumer Sales Practices Act, Ohio Revised Code § § 1345.01, et seq., Fraud, Express Warranty, Implied Warranty, Ohio Deceptive Trade Practices Act, Ohio Revised Code § § 4165.01, et seq., Unjust Enrichment, and Injunction Plaintiffs further seeks mandatory injunctive relief sufficient to inform consumers of: a) the existence of the ventilation holes; b) the need to refrain from obstructing these holes in order to achieve the claimed lowered tar of Marlboro Lights; c) the fact of Defendants' nicotine manipulation and chemical additions to their tobacco and the motivations therefore; and d) the fact that "light" smoke is actually more mutagenic than regular tobacco smoke.

## II. PARTIES, JURISDICTION AND VENUE

11. Plaintiffs bring this action in their individual capacity and on behalf of all others similarly situated.

12.     Plaintiffs are residents of Ohio, who purchased Phillip Morris's Marlboro Lights in Ohio based upon Phillip Morris's deceptive trade practices, fraud, express warranty, and implied warranty.

13.     The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which the Plaintiffs are citizens of a state different from the Defendants. This Court has jurisdiction over the subject matter of this matter pursuant to 28 U.S.C. 1332(d)(2) (Class Action Fairness Act of 2005).

14.     A substantial part of the events and omissions giving rise to the claims occurred in the Northern District of Ohio. Pursuant to 28 U.S.C. 1391(a)(2), venue for this action is proper in the Northern District of Ohio.

15.     Plaintiffs Eva Marie Phillips and Greg A. Phillips are residents of Summit County, Ohio, and Fairfield County, Ohio, respectively. Greg A. Phillips purchased and consumed on average approximately six to eight of Marlboro Lights cigarettes per day for approximately 5 years. Eva Marie Phillips purchased and consumed on average approximately one to two packs of Marlboro Lights cigarettes per day for one year prior to May 4, 2001, and prior to that she purchased and consumed on average approximately less than a pack per day for approximately four years. Plaintiffs Eva Marie Phillips and Greg A. Phillips were without knowledge of the conduct by Defendants alleged in this complaint, or of any facts from which it might reasonably be concluded that Defendants were so acting, or which would have led to the discovery of such action, until within two years of filing their claims.

16.     Through longstanding and fraudulent conduct, Defendants willfully concealed and misrepresented their manipulations of "light" cigarette design and composition.

7

17. Through the packaging of Marlboro Lights purchased by Plaintiffs and all Class members, Defendants represented that these cigarettes contained lower levels of tar and nicotine by using words such as "Lights," "Low Tar", and "Lowered Tar & Nicotine." The Marlboro Lights purchased and consumed by Plaintiffs and all Class members contained no disclosures, markings or instructions regarding: 1) the ventilation holes in the filter; 2) the need to refrain from obstructing these holes and from increasing puff volume or frequency in order to achieve the claimed lowered tar of Marlboro Lights; 3) the increased mutagenicity of "light" cigarette smoke; or 4) the alteration of nicotine levels through the use of chemical or other additives.

18. Defendant Philip Morris Companies Inc., n.k.a. Altria Group, Inc., is a Virginia corporation with its principal place of business at 6601 W. Broad St., Richmond, VA 23230. At all times relevant hereto, Philip Morris Companies Inc., n.k.a. Altria Group, Inc., through its wholly owned subsidiary Philip Morris Incorporated, a.k.a. Philip Morris Inc., a.k.a. Philip Morris USA Incorporate, a.k.a. Philip Morris USA Inc. (collectively "Philip Morris" or "Defendants"), engaged in the business of manufacturing, promoting, marketing, distributing and selling Marlboro Lights brand light cigarettes. Philip Morris conducts business in Ohio, and at all relevant times manufactured, promoted, marketed, distributed and sold cigarettes in interstate commerce and in Ohio.

19. Defendant Philip Morris Incorporated, a.k.a. Philip Morris Inc., a.k.a. Philip Morris USA Incorporate, a.k.a. Philip Morris USA Inc. ("PMI" or the "subsidiary") is a Virginia corporation with its principal place of business at 6601 W. Broad St., Richmond, VA 23230. PMI is a wholly owned subsidiary of Philip Morris Companies, Inc. At all

8

times relevant hereto, PMI engaged in the business of manufacturing, promoting, marketing, distributing and selling Marlboro Lights brand light cigarettes. PMI conducts business in Ohio, and at all relevant times manufactured, promoted, marketed, distributed and sold cigarettes in interstate commerce and in Ohio.

## III. CLASS ACTION ALLEGATIONS

20. Plaintiffs make these allegations pursuant to Federal Rule of Civil Procedure 23 and each prerequisite of Rule 23 applicable to the case is met.

21. Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. Without prejudice to later expansion, the Class which Plaintiffs seek to represent consists of all persons who purchased Defendants' Marlboro Lights cigarettes ("the Class") for personal consumption from the first date the Defendants placed their Marlboro Lights into the stream of commerce, up to the date this class is certified. Excluded from the Class definition are persons who are directors and officers of the Defendant Corporations, or their affiliates. Also excluded from the Class definition is any trial Judge presiding over this action and his or her immediate family members. This Class does not seek damages for personal injury or addiction.

22. The Class is composed of at least tens of thousands of persons, the joinder of whom is impracticable except by means of a class action. The disposition of their claims in a class action will benefit both the parties and the Court. Defendants sell many thousands of packs of Marlboro Lights in Ohio every year, and thus the Class is sufficiently numerous to make joinder impracticable, if not completely impossible.

23.     There is a well-defined community of interest in the questions of law and fact involving and affecting the parties to be represented.  Common questions of law and fact exist and such common questions predominate over any question of law or fact which may affect only individual Class members.  Such common questions include the following:

a)     Whether Defendants misrepresented the true tar and nicotine yields of the "light" cigarettes they manufactured, marketed, and/or distributed;

b)     Whether Defendants intentionally designed "light" cigarettes to generate misleading tar and nicotine measurements on the Cambridge Filter System while delivering significantly higher quantities of tar and nicotine to human smokers;

c)     Whether the Defendants violated, *inter alia*, the Ohio Deceptive Trade Practices Act through their course of fraudulent and deceptive conduct as alleged herein;

d)     Whether the Defendants were unjustly enriched at the expense of the Class members; and

e)     Whether the Class has been damaged and, if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or exemplary damages which the Class is entitled to plead and prove.

24.     Plaintiffs assert claims that are typical of the claims of the entire Class. They will fairly and adequately represent and protect the interests of the Class.  Plaintiffs

have no interests antagonistic to those of the Class.  Plaintiffs have retained counsel who are competent and experienced in relevant litigation.

25.     Defendants have acted or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class as a whole appropriate.

26.     Plaintiffs and the Class have suffered irreparable harm and damages as a result of Defendants' wrongful conduct as alleged herein.  Absent a representative action, Class members will continue to suffer losses, thereby allowing these alleged violations of law to proceed without remedy, and allowing Defendants to retain the proceeds of their ill-gotten gains.

27.     Plaintiffs anticipate that there will be no insurmountable difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

28.     All conditions precedent to the maintenance of this action have been met.

29.     Plaintiffs are not a party to any other pending litigation in which any question of law or fact in this litigation is to be adjudicated.

30.     A Class Action also provides a fair and efficient method for adjudication of the controversy for the following reasons:

a)      Common questions of law and fact, as stated more fully above predominate over any question affecting only individual members;

b)      Joinder of hundreds of thousands of tobacco fraud and/or Ohio Consumer Sales Practices Act, and/or violation of express and/or implied

warranty, and/or Ohio Deceptive Trade Practices, and/or unjust enrichment cases arising across the State of Ohio would be overwhelmingly complex, exceedingly time-consuming, and unduly burdensome to the courts in which such individual litigation would proceed;

c)     Individual litigation would magnify the delay and expense to all parties of litigating the wrongdoing, injuries, and harm caused by Defendants;

d)     Adjudicating these claims in the form of a Class Action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court;

e)     Prosecution of separate actions by individual Members of the Class presents the potential and high risk of inconsistent contradictions that would confront Defendants with incompatible standards of conduct;

f)     Plaintiffs believe and therefore aver that no other litigation of this type is currently pending in the State of Ohio; and

g)     This Court is an appropriate forum for this litigation because it has the power to exercise jurisdiction over absent class members who are Ohio residents and Defendants are corporations actively conducting business within the State of Ohio.

## IV.  FACTUAL ALLEGATIONS

### A.  Development of the Light Cigarette Market

31.    In 1987, the Tobacco Institute Testing Laboratory ("TITL"), a private laboratory operated by the cigarette industry, began conducting cigarette testing using the Cambridge Filter System. TITL has conducted cigarette testing at all relevant times since it began testing in 1987.

32.    According to a 1997 release by the Federal Trade Commission ("FTC") entitled "Cigarette Testing–Request for Public Comment," the methodology, processes and procedures that the Defendants, through TITL, have used and currently employ to test cigarettes are identical to those the FTC employed until 1987 in its own testing laboratory.

33.    Defendants promote Marlboro Lights through placement of the words "Lights", "Low Tar" and/or "Lowered Tar & Nicotine" on their cigarette packages. These statements are false and deceptive (True and correct copies of Marlboro Lights packages are attached hereto as Exhibits).

34.    Demand for light cigarettes has skyrocketed in recent years. According to findings published in the Centers for Disease Control Prevention publication Morbidity and Mortality Weekly Report, in an article entitled "*Filter Ventilation Levels in Selected U.S. Cigarettes, 1997*" ("CDC publication"), sales of light cigarettes made up 72.7% of the domestic cigarette market in 1995. By comparison, sales of light cigarettes a decade earlier, in 1985, accounted for only slightly more than half of the domestic market (51.9%).

**B.   Design Changes Negate Low-Tar Claims**

35.     Defendants have omitted and suppressed the fact that they manipulate the tar and nicotine deliveries of their light cigarettes through a variety of design parameters, including but not limited to: the inclusion of microscopic ventilation holes in or around cigarette filters; the modification of tobacco blend and weight; the modification of tobacco rod length and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH level.

36.     Many brands of light cigarettes are manufactured with ventilation holes in the filter. The holes are designed to allow the smoker to draw in additional air when inhaling. In theory, the additional air mixes with the tar, nicotine, and carbon monoxide in cigarette smoke and thereby reduces the relative levels of these substances per volume of smoke that enters the human body.

37.     Defendants' light cigarettes contain ventilation holes. The holes, however, are obstructed during normal use of the product because the holes are placed in the area of the filter that is covered by the smoker's lips or fingers. This blocking problem is exacerbated with Defendants' light cigarettes because the Marlboro Lights' vent holes are virtually invisible to the naked eye. Defendants' vent holes also are not marked (e.g. with a colored band or some other method) to reveal their existence or location.

38.     As a result of this design, the cigarettes do not fulfill the Defendants' claims of lowered tar and nicotine. According to studies cited in the CDC publication, blocking even some of the ventilation holes in light cigarettes can dramatically increase the smoker's exposure to the tar and nicotine contained in cigarette smoke.

14

39.    After analyzing fifteen different cigarette brands, a Massachusetts,

Department of Public Health ("MDPH") study stated that:

> Many brands have vents that are so tiny they are invisible to the naked eye. Often the placement of the holes makes it difficult if not impossible for a smoker to smoke a cigarette without blocking some or al of the vents.
>
> The cigarettes are designed so that it is "natural" to cover-up some or all of the filter vents and "natural" to breathe in heavier amounts of tar and nicotine.

40.    The Cambridge Filter System purports to measure the amount of tar and

nicotine in a cigarette with a machine that "mimics" the human smoking behavior. The

"inhaled" material is collected on a pad, extracted, and analyzed to arrive at the tar and

nicotine yield levels of that particular cigarette.

41.    In 1980, researchers conducted a study on low tar cigarettes, the results of

which are cited in the CDC publication. The study showed that blocking just half of the

ventilation holes in a cigarette containing 4 mg of tar, 0.5 mg of nicotine, and 5 mg of

carbon monoxide increased the Cambridge Filter System-measured tar yields by 60%,

nicotine levels by 62% and carbon monoxide levels by 73%.

42.    Based on this study, smokers of light cigarettes who block just half of the

vent holes in their cigarettes could inhale as much, or even more, tar, nicotine, and carbon

monoxide as that from a regular yield cigarette.

43.    A MDPH study based on 1997 data concluded that "when smokers place

their mouth or fingers over the vents, they keep outside air from diluting the mixture and

so take in higher levels of tar and nicotine." These facts were known to and knowingly

exploited by Defendants.

## C.   Increasing Puff Volume & Frequency

44.   Even if it were possible for a smoker *not* to block the vent holes,

Defendants' design for Marlboro Lights enables smokers to achieve total tar, nicotine and

carbon monoxide deliveries at least equal to that of regular non-light versions of the

cigarettes, simply by increasing puff volume and/or frequency. Defendants have long

been aware of this tendency and yet continue to market Marlboro Lights as "light" and

containing "low tar" or "lowered tar & nicotine."

45.   Upon information and belief, Defendants were fully aware of the

discrepancies between actual tar and nicotine deliveries and those achieved under

machine testing conditions, but nonetheless suppressed, omitted and withheld this

information from consumers.

46.   This knowledge and suppression is demonstrated by a 1974 Philip Morris

document entitled, "Some Unexpected Observations on Tar and Nicotine and Smoker

Behavior," which notes: "Generally, people smoke in such a way that they get more than

predicted by machines. This is especially true for dilution cigarettes [i.e. low tar, low

nicotine]. . . The FTC standardized test should be retained: It gives low ratings."

47.   Defendants' knowledge can be further demonstrated by other important

facts:

a)   Defendants manufacture, test and market their light cigarettes,

thereby providing them with increased knowledge and insight into the design

aspects and potential defects in their product with regard to tar and nicotine intake

levels; and

b)    Defendants are members of the very industry that conducts the

testing for tar, nicotine, and carbon monoxide levels in cigarettes. As such,

Defendants were, or should have been, particularly cognizant of the inaccuracies

in their testing methodologies and aware of the alternative, more accurate methods

of testing available. In particular, Defendants were, or should have been aware of

the Massachusetts method for testing tar and nicotine (discussed in the MDPH

study, supra), a method more reflective of actual smoking patterns. This method

indicates that tar and nicotine levels in light cigarettes and ultra-light cigarettes

(ultra-lights are generally defined as containing less than seven mg of tar) are

actually about twice as high as those found by the FTC method employed by the

cigarette industry. Differences between the Cambridge Filter System method and

Massachusetts methods were greatest for ultra-light cigarettes and greater for light

cigarettes than for full flavor cigarettes. Nicotine levels for ultra-light cigarettes,

for example, were more than 150% greater in Massachusetts testing than under the

Cambridge Filter System method.

### D.  Manipulation of Nicotine Amount, Form, & Impact

48.    Defendants also have employed and continue to employ various chemical

processes and additives in designing and manufacturing Marlboro Lights in order to

increase the discrepancy between the purported "low tar" and lower nicotine ratings and

the actual amounts of tar and nicotine deliveries. When Defendants purportedly lowered

tar in their cigarettes, they deliberately increased the amount of nicotine and chemically

altered its form so that it would escape detection under the Cambridge Filter System method.

49.     By doing so, Defendants sought to ensure that smoking light cigarettes would not make it easier for smokers to quit and that smokers of lights cigarettes would receive the nicotine "satisfaction" of a regular cigarette. Defendants tested their "Light" cigarette designs against their own internally established measure of "cigarette acceptability."

50.     Defendants also control and manipulate the nicotine levels in cigarettes through the use of reconstituted tobacco. Reconstituted tobacco is an amalgamation of tobacco stalks, stem, floor sweepings and dust that Defendants previously discarded, but now redeploy to enhance profits. In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine. The pieces are then combined to form a sheet, to which Defendants directly apply nicotine extract in the exact amount they desire. Through this application procedure, Defendants are able to control and manipulate the exact amount of nicotine that ultimately winds up in cigarettes smoked by consumers.

51.     Defendants manipulate the smoke pH in their light cigarettes in order to create more "free" nicotine in the smoke and thereby enhance the actual nicotine delivery to smokers beyond that measured by the smoking machines. Defendants add ammonia and other substances to tobacco to create a more potent "kick" in its cigarettes. Some of these additives liberate nicotine from its salt form and transform it into an extremely potent vaporized form. Thus, the nicotine is converted into a "freebase" form, just as

powdered cocaine is converted into crack cocaine. Significantly, however, the low tar and nicotine levels represented by Defendants and derived from the Cambridge Filter System testing method do not reflect the additional, freebase nicotine particles that are able to evade detection by the Cambridge Filter System.

52.     In addition to the use of chemical additives to increase nicotine bioavailability while generating reduced nicotine levels on the Cambridge Filter System, Defendants employ design techniques similar to those used to control and manipulate tar levels. Tobacco blend and weight, rod length and circumference, filters, tobacco processing, papers, and air dilution are all used to actively manipulate and control tar and nicotine levels.

53.     These tobacco manipulation techniques allow Defendants to maximize the amount of nicotine delivered to smokers, and to maintain the illusion of a "Light" cigarette, thereby retaining customers and maximizing their own profits by cornering higher market share.

54.     Defendants' manipulations are further evidenced by, *inter alia* the following internal documents and studies:

a)     A November 1971 Philip Morris internal report entitled, "Tar, Nicotine, and Smoking Behavior" illustrates Defendants' knowledge and ability to add nicotine to reduced tar cigarettes:

> Tar reduction [in our study] was accomplished by means of an air dilution technique. This results in a reduction of tar delivery. However, it also results in a reduction of nicotine delivery. Therefore, when the tar delivery was reduced to get the medium tar delivery, it also reduced the nicotine

> delivery by a like amount. Thus, just to maintain the original nicotine delivery required that nicotine be added to that cigarette.

This report determined that the level of nicotine which "resulted in the greatest cigarette acceptability" was apparently 1.3mg. In fact, the report even indicated Defendants' motivation to manipulate their light cigarettes in order to maintain higher levels of tar: "Low tar resulted in least acceptability at all levels of nicotine."

b)     A 1973 report by researcher Claude E. Teague, Jr. of competitor R.J. Reynolds, entitled "Implications and Activities Arising From the Correlation of Smoke pH with Nicotine Impact, Other Smoke Qualities, and Cigarette Sales" evidences the alteration of smoke pH by Philip Morris. The increase in smoke pH (usually through the addition of ammonia) increases the level of "free" nicotine in the cigarettes and provides a greater nicotine "kick" to smokers through faster absorption of nicotine into the blood stream. The report notes that "the most significant difference" between Reynolds's brands and Philip Morris's brands "has been in the area of smoke pH."

c)     A March 1978 Philip Morris report by J. Ryan and the Philip Morris USA Research Center entitled, "Exit-Brand Cigarettes, a Study of Ex-Smokers," notes:

> If the industry's introduction of acceptable low-nicotine products does make it easier for a dedicated smoker to quit, then the wisdom of the introduction is open to debate. (emphasis in original)

d)     An October 1990 Philip Morris research report which notes that nicotine strength in tobacco smoke can be increased through the addition of ammonia, nicotine salt or nicotine citrates. These chemical additives increase smoke pH, which "governs the ratio of nicotine in free protonated forms."

e)     Research performed for Philip Morris by Frank Ryan illustrated that cigarette sales could be predicted at a 96% accuracy rate using data on nicotine and acetaldehyde (a chemical compound with dopamine-type euphoria-enabling characteristics). According to an April 6, 1994-report entitled, "Philip Morris Research on Nicotine Pharmacology and Human Smoking Behavior," Ryan's studies could accurately "predict blindly which cigarettes would sell and which wouldn't based on the combination of nicotine and acetaldehyde delivery."

### E.  Increased Mutagenicity

55.    The AMES test is a test utilized by scientists to assess the mutagenic property of a substance. The AMES test has been employed by the tobacco industry and by Defendants to ascertain the levels of harmful biological activity in cigarette smoke.

56.    The results of these tests indicate that the tar found in regular cigarette smoke has a lower AMES activity on a reverted per milligram basis than the tar found in light cigarette smoke. In other words, light cigarette smoke has more harmful biological activity per milligram of tar than regular cigarette smoke.

### F.  Defendants' Omissions and Fraudulent Concealment

57. Knowing the truth, but motivated by profit and market share, Defendants suppressed and failed to disclose to the public material facts concerning Marlboro Lights cigarettes.

58. While the packaging containing Defendants' light cigarettes prominently displays the words "Lights" and "Low Tar" or "Lowered Tar & Nicotine," Defendants omitted and continue to omit numerous material facts regarding their light cigarettes, including:

    a)    the existence and purpose of ventilation holes;

    b)    the effect of blocking some or all of these holes;

    c)    the fact that the tar and nicotine levels measured by the smoking machines do not accurately reflect the actual amount of tar and nicotine ingested by the human smoker;

    d)    the fact that Defendants manipulated nicotine levels in their light cigarettes through various techniques, including:

        i    modifying tobacco blend, weight, rod length, and circumference;

        ii    using reconstituted tobacco sheets and/or expanded tobacco; and

        iii    increasing smoke pH level by adding chemicals such as ammonia;

    e)    the fact that Defendants manipulated nicotine levels in order to maximize nicotine delivery while reducing tar and nicotine ratings in order to support their claims that Marlboro Lights were "light" and contained "low tar."

f)     the fact that the techniques employed by Defendants purportedly to reduce the levels of tar in their Marlboro Lights - including increased air dilution through the use of ventilation holes - actually increase the mutagenicity of the tar ingested by the consumer.

59.     Defendants knew of (a) the inaccuracies associated with the measurement of the tar and nicotine levels in these products, (b) the tests indicating increased mutagenicity of low tar smoke and (c) the deceptive nature of the terms used on their "light" cigarette packages to describe the "low tar" cigarettes. Yet, in the face of increasing sales, Defendants chose not to reveal such information, or effectively disclose to consumers the true nature of their so called "low-tar" cigarettes.

60.     Defendants also knew that the omitted information was material. For example, Defendants believed that consumers' motivation to smoke light cigarettes stems from the general perception that light cigarettes pose less risk of harmful consequence than regular cigarettes. Defendants' belief as to this motivation is evidence by the following:

a)     "Exit-Brand Cigarettes, a Study by Ex-smokers," supra, which explains:

> The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low-delivery cigarette tells us something very important about him. He is concerned about his health, and he is willing to do something about it.

b)     March 20, 1984-edition of Philip Morris' "The Cigarette Consumer," which states:

Historically, motivation has come from health issue.

- People willing to stick with lower tar because they feel they are doing themselves a favor.
- Most successful new brands have had low tar/health motivation: Merit.

61. Because they knew of shortcomings in the testing methodologies, Defendants were aware of the inaccuracies and misleading nature of the packaging of their light cigarettes, and these inaccuracies - as well as information regarding the higher mutagenicity of lights cigarette smoke - should have been revealed and explained to the purchasers and consumers of their light cigarettes.

62. Despite the knowledge, Defendants failed to reveal these inaccuracies, any information regarding increased mutagenicity, the ongoing tobacco manipulation or the reasons for such manipulation. Instead, Defendants sold light cigarettes to Plaintiffs and members of the Class by making materially false, misleading and deceptive claims of lowered tar and nicotine levels.

63. Defendants knew and exploited the short comings in the Cambridge Filter System method, yet consciously and deliberately acted to conceal this information and preclude its dissemination to the consumers.

64. Defendants over the course of decades have avoided, concealed, suppressed and failed to disclose their active manipulation of "light" cigarettes to achieve bogus Cambridge Filter System method ratings. Through longstanding and fraudulent conduct Defendants willfully concealed and misrepresented the true nature of Marlboro Lights.

## COUNT I  CONSUMER SALES PRACTICES ACT

65.     Plaintiffs reallege and incorporate by reference all other paragraphs of this complaint as if fully set forth herein and further allege:

66.     This claim is brought pursuant to the Ohio Consumer Sales Practices Act, Ohio Revised Code § § 1345.01, et seq.

67.     Plaintiffs and the Class are entitled to bring this action pursuant to Ohio Revised Code § § 1345.02, 1345.03, and 1345.09.

68.     Plaintiffs and the Class entered into consumer transactions with the Defendants by purchasing Marlboro Lights cigarettes.

69.     During the course of these transactions, the Defendants engaged in unfair or deceptive trade practices including the sale and advertisement of Marlboro Lights by an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and the knowing concealment of material facts, including:

a)      incorrectly advertising and making false claims that their light cigarettes, when smoked under normal use, contained lower tar and nicotine than regular cigarettes;

b)      failing to disclose that changes in cigarette design and composition were intended to deliver lowered tar and nicotine levels under machine testing conditions while delivering heightened levels of these compounds when smoked by consumers;

c)      placing vent holes on the filter of light cigarettes that are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the claimed effects of the low tar, low nicotine brand;

25

d)      failing to mark the vent holes or make them visible to the naked eye such that smokers could attempt to correctly smoke the cigarettes to obtain the claimed reduced tar and nicotine;

e)      failing to disclose to consumers that smoking Defendants' cigarettes with the vent holes blocked results in the smoker receiving an increased amount of tar and nicotine;

f)      failing to instruct smokers, on the packaging or elsewhere, on how to correctly smoke the cigarettes to obtain the claimed lowered tar and nicotine;

g)      failing to disclose to consumers that the techniques employed by Defendants to purportedly reduce the levels of tar in their Marlboro Lights actually increase the mutagenicity of the tar ingested by the consumer and thereby increase the levels of harmful toxins ingested by the consumer;

h)      manipulating the nicotine levels in their light cigarettes; and

i)      failing to inform consumers as to the manipulation of the tobacco in Marlboro Lights by, *inter alia*, the addition of chemicals, as well as Defendants' reasons for such manipulation.

70.      As a direct result of Defendants' violations, Plaintiffs and the Class are aggrieved and suffered ascertainable losses by, among other things, failing to receive the qualities and economic value promised to them: a low tar, low nicotine cigarette.

WHEREFORE, Plaintiffs and the Class request the following relief:

a) Certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Class and designation of the named Plaintiffs as the representatives of the Class;

b) A declaratory judgment that Defendants' acts, practices and conduct have violated the Act;

c) A refund of the amounts paid to purchase Marlboro Lights;

d) An order enjoining Defendants from continuing to violate the Act through the acts and practices complained of herein;

e) Treble damages;

f) Attorney's fees and court costs;

g) Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers: (i) the existence of vent holes; (ii) the importance of same, (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same; and

h) Such other or further relief as this Court may deem appropriate.

## COUNT II COMMON LAW FRAUD

71. Plaintiffs reallege and incorporate by reference all other paragraphs of this complaint as if fully set forth herein and further allege:

72.     Defendants made false representations of fact with knowledge of their falsity and/or with utter disregard and recklessness about their falsity such that Defendants' knowledge may be inferred.

73.     Defendants had a duty to disclose the facts about their "Light" cigarettes but knowingly concealed such facts from Plaintiffs and the Class.

74.     These aforesaid misrepresentations and concealments of fact were made to the Class as a whole and were material to the purchase of Defendants' "Light" cigarettes by Plaintiffs and the Class.  These misrepresentations and concealments include but are not limited to:

a)     incorrectly advertising and making false claims that their "Light" cigarettes, when smoked under normal use, contained lower tar and nicotine than regular cigarettes;

b)     failing to disclose that changes in cigarette design and composition were intended to deliver lowered tar and nicotine levels under machine testing conditions while delivering heightened levels of these compounds when smoked by consumers;

c)     failing to disclose that vent holes on the filter of "Light" cigarettes are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the claimed effects of the low tar, low nicotine brands;

d)     failing to mark the vent holes or make them visible to the naked eye such that smokers could attempt to correctly smoke the cigarettes to obtain the claimed reduced tar and nicotine;

28

e) failing to instruct smokers, on the packaging or elsewhere, on how to correctly smoke the cigarettes to obtain the claimed lowered tar and nicotine;

f) failing to disclose to consumers that the techniques employed by Defendants to purportedly reduce the levels of tar in their Marlboro Lights actually increase the mutagenicity of the tar ingested by the consumer and thereby increase the levels of harmful toxins ingested by the consumer;

g) manipulating the nicotine levels in their "Light" cigarettes; and

h) failing to inform consumers as to the manipulation of the tobacco in Marlboro Lights by, *inter alia*, the addition of chemicals, as well as Defendants' reasons for such manipulation.

75. The aforesaid misrepresentations and concealments were made with the intent of misleading Plaintiffs and the Class into relying upon them.

76. The Plaintiffs and the Class were justified in relying on the representations and concealments and did in fact so rely, as would have the ordinary reasonable person.

77. As a direct result of the Defendants' fraudulent conduct the Plaintiffs and the Class were damaged and suffered ascertainable losses by, among other things, failing to receive the qualities and economic value promised to them: a low tar, low nicotine cigarette.

78. Plaintiffs and the Class do not seek damages for mental or emotional distress or medical monitoring.

WHEREFORE, Plaintiffs and the Class request the following relief:

a)     Certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Plaintiffs Class and designation of the named Plaintiffs as the representatives of the Class;

b)     A refund of the amounts paid to purchase Marlboro Lights;

c)     Compensatory Damages;

d)     Attorney's fees and court costs;

e)     Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers: (i) the existence of vent holes; (ii) the importance of same, (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same;

f)     Such other or further relief as this Court may deem appropriate.

### COUNT III EXPRESS WARRANTY

79.    Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

80.    The Defendants expressly warranted that these cigarettes were Light, delivered less tar and nicotine than regular cigarettes, were safer than regular cigarettes,

and that they were safe and fit for the purposes for which they were intended, and they were not.

81.     During the course of these transactions, the Defendants expressly, falsely, and deceptively misrepresented that their Marlboro Lights cigarettes had characteristics, ingredients, uses, benefits, and qualities that they did not have, expressly, falsely, and deceptively misrepresented that their Marlboro Lights cigarettes were new when in fact they were altered, reconditioned, and reclaimed, by expressly, falsely, and deceptively misrepresented that their Marlboro Lights cigarettes were of a particular standard, quality, and grade that they did not and were not, and by falsely and deceptively misrepresenting that their Marlboro Lights delivered less tar and nicotine, when in fact they did not.

82.     These express warranties were intended to induce and did induce the Plaintiffs and the Class to purchase these Light cigarettes.

83.     These express warranties were false.

84.     At all times, the Defendants knew that these express warranties were false.

85.     The Defendants breached and violated their aforesaid express warranties.

86.     These cigarettes were not Light, did not deliver less tar and nicotine than regular cigarettes, were not safer than regular cigarettes, and they were not safe, merchantable, and fit for the purposes for which they were intended.

87.     Plaintiffs and the Class relied upon these express warranties to their detriment.

31

88. As a direct and proximate result of Defendants' breach of their express warranties, the Plaintiffs and the Class have suffered ascertainable, economic harm, damage, and loss by, among other things, Defendants' failing to provide them with (and, thus, their failing to receive) the qualities, benefits, and economic value promised to them: a low tar, low nicotine cigarette.

WHEREFORE, Plaintiffs and the Class request the following relief:

a)   Certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Plaintiffs Class and designation of the named Plaintiffs as the representative of the Class;

b)   A refund of the amounts paid to purchase Marlboro Lights;

c)   Compensatory and PunitiveDamages;

d)   Attorneys fees and court costs;

e)   Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers: (i) the existence of vent holes; (ii) the importance of same, (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same; and

f)   Such other or further relief as this Court may deem appropriate

## COUNT IV IMPLIED WARRANTY

89.     Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

90.     The Defendants impliedly warranted that these cigarettes were Light, delivered less tar and nicotine than regular cigarettes, were safer than regular cigarettes, were safe and fit for the ordinary purposes for which they were used and intended, and that they were safe, merchantable, and fit for the ordinary purpose for which they were intended, and they were not.

91.     The Defendants impliedly warranted that the aforesaid products were fit for the particular purposes for which they were required and Defendants knew and should have known that Plaintiffs and the members of the Class were relying upon each of the Defendants' skills and judgment to select and furnish suitable goods, and Plaintiffs and the members of the Class did rely upon said implied warranties.

92.     During the course of these transactions, the Defendants engaged in deceptive trade practices by impliedly and falsely making deceptive and unfair representations as previously set forth herein and by impliedly, falsely, impliedly, and deceptively misrepresenting that their Marlboro Lights cigarettes had characteristics, ingredients, uses, benefits, and qualities that they did not have, by falsely and deceptively misrepresenting that their Marlboro Lights cigarettes were new when in fact they were altered, reconditioned, and reclaimed, and by falsely, impliedly, and deceptively misrepresenting that their Marlboro Lights cigarettes were of a particular standard, quality, and grade that they were not.

93. These implied warranties were intended to induce and did induce the Plaintiffs and the Class to purchase these Light cigarettes.

94. These implied warranties were false.

95. At all times, the Defendants knew that these implied warranties were false.

96. The Defendants breached and violated their aforesaid implied warranties.

97. These cigarettes were not Light, did not deliver less tar and nicotine than regular cigarettes, were not safer than regular cigarettes, and they were not safe, merchantable, and fit for the purposes for which they were intended.

98. The Defendants breached their aforesaid implied warranties, said products were not safe and free from defects, were not merchantable and were not fit for the ordinary and particular purposes for which they were to be used and required at the time they left the possession and control of the Defendants.

99. Plaintiffs and the Class relied upon these implied warranties to their detriment.

100. As a direct and proximate result of Defendants' breach of their implied warranties, the Plaintiffs and the Class have suffered ascertainable, economic harm, damage, and loss by, among other things, Defendants' failing to provide them with (and, thus, their failing to receive) the qualities, benefits, and economic value promised to them: a low tar, low nicotine cigarette.

WHEREFORE, Plaintiffs and the Class request the following relief:

34

a)    Certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Plaintiffs Class and designation of the named Plaintiffs as the representative of the Class;

b)    A refund of the amounts paid to purchase Marlboro Lights;

c)    Compensatory and Punitive Damages;

d)    Attorney fees and court costs;

e)    Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers: (i) the existence of vent holes; (ii) the importance of same, (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same; and

f)    Such other or further relief as this Court may deem appropriate.

101.

## COUNT V OHIO DECEPTIVE TRADE PRACTICES ACT

102.   Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

103.   This claim qualifies under and is brought pursuant to the Ohio Deceptive Trade Practices Act, R.C. 4165.01 et seq.

104. Plaintiffs and the Class entered into transactions with the Defendants by purchasing Defendants' Marlboro Lights cigarettes.

105. During the course of these transactions, the Defendants engaged in deceptive trade practices and violated the Ohio Deceptive Trade Practices Act by making deceptive and unfair representations as previously set forth herein and by falsely and deceptively misrepresenting that their Marlboro Lights cigarettes had characteristics, ingredients, uses, benefits, and qualities that they did not have, by falsely and deceptively misrepresenting that their Marlboro Lights cigarettes were new when in fact they were altered, reconditioned, and reclaimed, by falsely and deceptively misrepresenting that their Marlboro Lights cigarettes were of a particular standard, quality, and grade, when in fact they were not, and by falsely and deceptively misrepresenting that their Marlboro Lights delivered less tar and nicotine, when in fact they did not.

106. Plaintiffs and the Class relied upon these false and deceptive misrepresentations to their detriment.

107. As a direct and proximate result of these false and deceptive misrepresentations and the Defendant's violations of the Ohio Deceptive Trade Practices Act, the Plaintiffs and the Class have suffered ascertainable, economic harm, damage, and loss by, among other things, Defendants' failing to provide them with (and, thus, their failing to receive) the qualities, benefits, and economic value promised to them: a low tar, low nicotine cigarette.

WHEREFORE, Plaintiffs and the Class request the following relief:

a) Certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Plaintiffs Class and designation of the named Plaintiffs as the representative of the Class;

b) A declaratory judgment that Defendants' acts, practices, and conduct have violated the Act

c) A refund of the amounts paid to purchase Marlboro Lights;

d) Compensatory and Punitive Damages;

e) Attorneys fees and court costs;

f) Appropriate equitable relief, including but not limited to, an order directing that Defendants conduct a corrective advertising campaign to explain to smokers: (i) the existence of vent holes; (ii) the importance of same, (iii) a method, if one exists, by which a smoker can smoke the low tar, low nicotine cigarette and achieve Defendants' claims of lowered tar and nicotine; (iv) the AMES test results and the importance thereof; and (v) the deliberate manipulation of tar and nicotine levels in Defendants' Marlboro Lights and the reasons for same; and

g) Such other or further relief as this Court may deem appropriate.

### COUNT VI UNJUST ENRICHMENT

108. Plaintiffs reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

109. As stated more particularly above, Defendants embarked on and carried out a scheme of marketing and selling light cigarettes by falsely and deceptively advertising that the cigarettes were "Lights," or contained "Low Tar"or "Lowered Tar & Nicotine."

Defendants refused and failed to inform consumers that the tar in their light cigarette smoke contains higher levels of harmful toxins than the tar in regular cigarette smoke. In addition, Defendants refused and failed to inform consumers that the tobacco in their Marlboro Lights was manipulated through, *inter alia*, the addition of chemicals, and that such manipulation was conducted in order to maximize nicotine delivery and thereby increase sales.

110.  Defendants' omissions and practices resulted in Plaintiffs and the Class purchasing light cigarettes in order to receive a low tar, low nicotine alternative to regular cigarettes, but not getting the benefits of less tar and nicotine than in regular cigarettes.

111.  Defendants' practices further resulted in Plaintiffs and the Class purchasing light cigarettes without understanding the true nature of Defendants' product or that Defendants manipulated the tobacco in their light cigarettes to increase their own ill-gotten profits.

112.  The monies paid by Plaintiffs and the Class to Defendants in the purchase of Marlboro Lights conferred substantial benefits upon Defendants. Defendants knew of and appreciated the benefits conferred upon them by Plaintiffs and the Class and accepted and retained these benefits.

113.  Under these circumstances, it would be inequitable and unjust for Defendants to retain the benefits conferred by Plaintiffs and the Class. Therefore, Plaintiffs seeks disgorgement of Defendants' ill-gotten profits attributable to purchases made by each individual class member. Plaintiffs do not seek disgorgement of all Defendants' profits.

38

WHEREFORE, Plaintiffs and the members of the Class seek certification of this action as a class action pursuant to Federal Civil Rule 23 on behalf of the proposed Plaintiffs Class and designation of the named Plaintiffs as the representatives of the Class; as well as an award of damages and equitable relief in the form of appropriate restitution or, in the alternative, disgorgement of all earnings, profits, compensation and benefits obtained by Defendants attributable to purchases made by each individual class member and all other relief as the Court may deem appropriate.

### COUNT VII INJUNCTIVE AND EQUITABLE RELIEF

114.   Plaintiffs hereby reallege and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

115.   Defendants manufacture, distribute and/or sell lights cigarettes without explaining to consumers that the lowered tar and nicotine claimed by Defendants is not obtained under the consumers' normal and foreseeable patterns of use. Defendants fail to disclose that the techniques employed by them to purportedly reduce the levels of tar in their Marlboro Lights actually increase the mutagenicity of the tar ingested by the consumer. Defendants also fail to disclose their intentional manipulation of the tobacco in their light cigarettes and the financial motivation of such manipulation. Plaintiffs and the Class therefore request equitable relief in the form of revised disclosures, a corrective advertising campaign, or equivalent remedial and corrective action, at Defendants' expense, to make the terms "Lights" and "Low Tar" not misleading, to disclose

appropriate information regarding the increased mutagenicity of the tar in light cigarette smoke and to disclose their tobacco manipulation and the reasons therefor.

116.    Plaintiffs and the Class will suffer irreparable harm if the requested injunctive relief is not granted.  The hardships that Plaintiffs and the Class would endure if the requested injunctive and equitable relief are denied greatly outweigh any hardships that Defendants may endure if such relief is granted.  An injunction requiring the appropriate disclosures would result in minimal monetary hardship to Defendants while preventing potentially drastic harm to a vast number of Class members.  Furthermore, such prospective relief may not be obtained through monetary compensation by law, but may only be obtained through an injunction.

117.    As a proximate result of Defendants' conduct described herein, and in consideration of the above factors, Plaintiffs, on behalf of themselves and all other similarly situated, are entitled to the requested injunctive and equitable relief.  WHEREFORE, Plaintiffs and the Class request appropriate injunctive and equitable relief.

## JURY DEMAND

Plaintiffs demand a jury determination of all issues so triable.

Respectfully submitted,

RUSSELL SMITH, SCID 0020920
R. BRYAN NACE, SCID 0030254
503 Key Building

40

159 S. Main Street
Akron, Ohio 44308
Phone (330) 434-7167
Fax (330) 434-1795
russ@russsmithlaw.com
nacerb@ljextra.com


Gerson H. Smoger
SMOGER & ASSOCIATES
3175 Monterey Boulevard Suite 3
Oakland, California 94602
(510) 531-4529


Terence E. Scanlon (0025241)
101 Clemson Court
Elyria, OH  44035
(440) 323-5119
*Attorneys for Plaintiffs*